**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN ANTONIO CRUZ, | : | Civil No. 1:21-CV-00655 |
| Plaintiff, | : | |
| v. | : | |
| W.T. AUKER and L. MARZZACCO, | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983 in which Plaintiff alleges that Defendants violated his right to practice his Jewish faith by denying him religious meals during Passover. The court conducted a bench trial on Plaintiff's claims. As discussed below, the court finds Defendant Wayne Auker liable for violation of Plaintiff's rights, but finds Defendant Marzzacco not liable. Defendant Auker will be ordered to pay Plaintiff nominal damages of $1 and punitive damages of $10,000.

### Background and Procedural History

Plaintiff, John Antonio Cruz, filed his complaint on March 13, 2021, and the court received and docketed it on April 9, 2021. (Doc. No. 1.) The case was initially assigned to United States District Judge Christopher C. Conner. After Judge Conner granted Cruz's motion for leave to amend the complaint in part,

(Doc. No. 44), his amended complaint (Doc. No. 40) became the operative complaint, and the case proceeded on his First Amendment free exercise, First Amendment retaliation, and Fourteenth Amendment equal protection claims. Defendants filed an answer on February 23, 2023. (Doc. No. 52.)

On March 1, 2024, Judge Conner denied Cruz's motion to supplement his complaint to include a claim for permanent injunctive relief requiring the Pennsylvania Department of Corrections ("DOC") to provide appropriate religious meals for Jewish inmates observing Passover and other religious ceremonies in the future. (Doc. No. 115.) Following the close of discovery, Judge Conner issued an opinion on July 30, 2024, addressing the parties' cross motions for summary judgment. (Doc. Nos. 129–30.) Judge Conner denied Cruz's motion for summary judgment, and granted in part and denied in part the Defendants' motion, finding that there were genuine issues of material fact as to (a) whether Defendants violated Cruz's rights to free exercise and equal protection; (b) whether Defendants were entitled to qualified immunity; and (c) whether Cruz exhausted administrative remedies with respect to his claims against Defendant Marzzacco. (*Id.*) Judge Conner granted Defendants' motion for summary judgment with respect to Cruz's retaliation claim because Cruz failed to exhaust administrative remedies with respect to that claim. (*Id.*) Accordingly, the case proceeded as to Cruz's free exercise and equal protection claims against Defendants Auker and Marzzacco.

Judge Conner referred the case to mediation on August 20, 2024, which proved unsuccessful in resolving the case. (Doc. Nos. 132, 135.) The case was reassigned to the undersigned on October 28, 2024, in advance of Judge Conner's retirement.[1] On January 14, 2025, the court scheduled the case for a bifurcated bench trial and evidentiary hearing on the issue of exhaustion of administrative remedies on July 14, 2025. (Doc. No. 143.) The court continued the trial by order on June 23, 2025, due to the court's obligation to preside over a criminal trial on the same date. (Doc. No. 156.) During a subsequent telephonic conference to discuss the trial schedule, counsel for defendants waived the affirmative defense of failure to exhaust administrative remedies on the remaining claims. (Doc. No. 161.) The court issued an order scheduling the case for a bench trial on March 16, 2026. (Doc. No. 162.) The bench trial occurred as scheduled on March 16, 2026. (Doc. No. 181.)

## BENCH TRIAL

During the bench trial, the court heard testimony from five witnesses: Cruz; the two Defendants; Andrew Hebel, a correctional officer in the prison; and Kenneth White, another inmate who was in a cell near Cruz's at the time of the events in question.

---

[1] Judge Conner retired from the court in January 2025.

The first witness to testify was Hebel. He testified that he worked the 2:00 p.m. to 10:00 p.m. shift in the prison during the relevant period. (Trial Transcript at 20:13.) Hebel testified that during Passover, Cruz asked him where his "Passover bag was." (*Id.* at 21:17–18.) Hebel told Cruz that he would contact the dietary department about the bag. (*Id.* at 21:20–21.) Hebel testified that he subsequently called the dietary department and asked if Cruz was on the approved list to receive Passover meals. (*Id.* at 21:22–22:1.) Hebel was unsure if the dietary department took any actions to fix the issue after he contacted them. (*Id.* at 24:18–25:5.)

Hebel testified that the night after Cruz first approached him about his missing Passover bag, he spoke with him again at dinner time and told him that he had not received a Passover meal. (*Id.* at 25:8–11.) Hebel again called the dietary department to attempt to resolve the issue, but was unsure if it was resolved after the call. (*Id.* at 25:21–26:1.)

On cross-examination, Hebel testified that he could not say for sure whether he had spoken with Auker or Marzzacco when he called the dietary department. (*Id.* at 32:3–14.) Hebel also testified that it was unlikely that he would have spoken with Auker specifically because he and Auker worked on different shifts at the relevant time. (*Id.* at 32:15–23.)

The court next heard testimony from White. White testified that he is a fellow member of the Jewish community who also observed Passover in 2020. (*Id.* at 38:8–9.) White testified that both he and his cellmate, Granville Tucker, who is also Jewish, received Passover meals. (*Id.* at 38:10–20.) When White and Tucker observed that Cruz had not received Passover meals, they spoke to prison officials to say that Cruz should receive the meals. (*Id.* at 39:8–13.) White testified that he believed he spoke with Defendant Auker about the situation, but could not identify Auker in the courtroom when asked to do so. (*Id.* at 39:14–21.) White also testified that he recalled seeing Cruz speaking with Auker and Sergeant Irvin about his missing Passover meals. (*Id.* at 39:14–24.) According to White, a woman he knew as "Mrs. M." delivered the Passover meals in the mornings during Passover. (*Id.* at 42:14–22.) White could not identify Marzzacco or any other person in the courtroom as "Mrs. M." (*Id.* at 43:6–7.) White testified that he remembered an officer asking Mrs. M. if Cruz was supposed to get a Passover meal as well. (*Id.* at 44:1–3.)

On cross-examination, White admitted that although he could remember the contents of the conversation when he and Tucker advocated for Cruz to also receive Passover meals, he could not specifically remember the time of day when the conversation occurred. (*Id.* at 48:8–12.) White noted that his inability to remember the exact time of day was "[p]robably because it was six years ago."

(*Id.*) White also noted that both he and his cellmate gave Cruz portions of their Passover meals when they saw that he had not received them. (*Id.* at 48:14–23.)

Cruz called himself as the last witness in his case in chief. He testified that sometime around April 2, 2020, the chaplain in the prison made a list of all the inmates who intended to sign up for Passover. (*Id.* at 54:9–21.) Cruz said that he was the seventh inmate to add his name to the list. (*Id.* at 54:21.)

Crus testified that the day before that, on April 1, 2020, he noticed that his "bags were being shorted." (*Id.* at 56:18–19.) Specifically, Cruz testified that he was receiving less than the allotted amount of peanut butter and cottage cheese in his regular Kosher meals. (*Id.* at 56:19–57:2.) Cruz testified that he submitted a grievance complaining about the portions, but that the grievance was immediately sent back as improper because it complained about the portions other Jewish inmates were receiving, and not just his own portions. (*Id.* at 62:2–6.) Cruz testified that he then submitted a second grievance, Grievance Number 860818, which was admitted into the record as Plaintiff's Exhibit 1. Grievance Number 860818 was filed on April 8, 2020. (Ex. P1.) Shortly after Cruz submitted the grievance, he observed that Defendant Auker delivered Passover meals to his housing unit but did not deliver one to him. (Trial Transcript at 65:13–19.)

Cruz immediately told correctional officer Burgain, Unit Manager Hamor, and Sergeant Irvin that he had not received his required Passover meal. (*Id.* at

66:4–16.) When the correctional officers left the unit on a shift change, he then told the same thing to correctional officer Hebel. (*Id.* at 67:4–7.) Hebel told Cruz that he spoke with the prison's chaplain and verified that Cruz was supposed to receive Passover meals, and stated that he would call the dietary department on his behalf. (*Id.* 70:24–71:1.)

Cruz testified that he was again denied a Passover meal on April 9, 2020, and that Hebel asked Marzzacco whether Cruz was supposed to get the meal. (*Id.* at 78:24–79:4.) According to Cruz, Marzzacco responded that Cruz's name was not on the list for Passover meals. (*Id.* 79:5–10.) Cruz again told Hebel that he was not receiving his Passover meals, and Hebel told him to wait and see what happened at dinner. (*Id.* at 79:23–80:4.) Cruz testified that when he again did not receive his Passover meal at dinner, Hebel called the dietary department about the issue in front of him. (*Id.* at 80:5–11.) He testified that he continued to not receive his Passover meals until April 14, 2020. (*Id.* at 80:17–20.) Cruz then moved into evidence Defendants' Exhibit 4, a copy of the initial review response to his grievance complaining about the lack of Passover meals, in which Defendant Auker stated that the dietary department received word from Chaplain Hansard on April 13, 2020, that Cruz was not receiving his Passover meals. (*Id.* at 82:20–83:15; Ex. D4.)

Cruz testified that prior to Chaplain Hansard informing the dietary department about the missing Passover meals, he informed Defendant Auker that he was not receiving his Passover meals via an inmate request to staff form on April 10, 2020. (Trial Transcript at 83:22–84:14.) Cruz moved a copy of that request into evidence as Plaintiff's Exhibit 4. (*Id.* at 84:1–14; Ex. P4.)

According to Cruz, he was unable to sleep and had no energy due to not eating during Passover. (*Id.* at 89:13–14.) Cruz also experienced "growing pain type pains in [his] knees." (*Id.* at 89:15.) To help Cruz deal with his hunger, White and Tucker shared some of their Passover meals with him. (*Id.* 89:20–90:10.) Cruz testified that at lunchtime on April 14, 2020, he received a Passover meal that was delivered by "Miss M," who noted that Cruz was now on the list to receive Passover meals. (*Id.* at 90:17–21.) He continued to receive meals that did not violate his Jewish faith through April 16, 2020. (*Id.* at 91:3–8.)

On cross-examination, Cruz confirmed that Defendant Auker never personally came to his cell during the relevant period. (*Id.* at 93:24–94:1.) Cruz also acknowledged that he did not have any personal knowledge that Hebel had spoken with Auker when he had called the dietary department to ask about Cruz not receiving Passover meals. (*Id.* at 94:2–9.) Similarly, Cruz did not have any personal knowledge about which officials answered the phone in the dietary

department on any other occasions when someone called the department to ask about Cruz's meals. (*Id.* at 94:10–20; 95:1–8; 95:12–17; 96:23–97:10.)

At the conclusion of Cruz's case in chief, Defendants called Defendant Auker to the stand. (*Id.* at 111.) Auker testified that he was the food service manager at SCI-Benner Township at all relevant times and that he continues to hold that position now. (*Id.* at 111:15–21.) Auker testified that in that role he supervises 22 instructors, 4 supervisors, and approximately 300 inmates in food service roles. (*Id.* at 111:22–112:1.)

Auker testified that in 2020, he received a list of inmates who were signed up to receive Passover meals from Chaplain McCoy. (*Id.* at 112:2–25.)[2] The list he received from McCoy contained Cruz's name and other inmates' names. (*Id.* at 113:11–17; Ex. P2.) After receiving the list from McCoy, he manually typed the inmates' names into a spreadsheet and did not copy and paste the information. (*Id.* at 116:11–25.) Auker testified that he put the information in manually so that he could sort it by the inmates' housing blocks. (*Id.* at 116:24–117:4.)

The spreadsheet Auker prepared—which had been previously admitted into the record as Exhibit D2—did not include Cruz's name. (*Id.* at 117:14–118:5; Ex. D2 at DOC000125.) Auker explained that Cruz's absence from the list "was

---

[2] The list was entered into the record as Exhibit D1.

probably just an oversight of me not putting [his name] on there." (*Id.* at 118:10–13.) Auker testified that he did not deliberately leave Cruz's name off the list. (*Id.* at 118:14–16.)

Auker testified that he first learned of Cruz's absence from the list when he was contacted by Chaplain Hansard on a date he could not recall. (*Id.* at 120:8–121:1.) According to Auker, he corrected the error immediately and ensured that Cruz would have a Passover meal at the next mealtime. (*Id.* at 121:2–6.) Auker prepared an updated list that included Cruz's name. (*Id.* at 184:22–185:8; Ex. D3.)

With respect to Cruz's attempts to contact the dietary department, Auker testified that he did not receive any of the phone calls regarding Cruz's absence from the Passover meals list. (*Id.* at 122:22–123:3.) Auker also testified that he did not recall receiving Cruz's request to staff about the missing Passover meals. (*Id.* at 123:13–17.) Auker testified that the earliest he would have possibly received Cruz's request to staff was April 13, 2020, because Cruz submitted it on April 10, a Friday, and Auker was not in the office until April 13, a Monday. (*Id.* at 125:20–126:3.) Auker further testified that he did not always check his mail on Mondays, and that he therefore may not have seen the document until April 14, a Tuesday. (*Id.* at 126:9–127:6.)

With respect to Cruz's grievance about half-portion meals that was filed before Passover, Auker testified that he did not know about the grievance "because

it never made it to, it never made it to me because it was denied." (*Id.* at 127:17–19.) After his counsel refreshed his recollection with Exhibit P1, however, Auker admitted that he had responded to Cruz's grievance on April 30, 2022. (*Id.* at 128:1–17.) Auker testified that he did not deny Cruz his Passover meals because he had filed a grievance against him. (*Id.*)

Following brief cross-examination and re-direct examination, Auker admitted, on questioning from the court, that Cruz was the only person omitted from his spreadsheet after he received the initial list from the chaplain. (*Id.* at 132:22–133:5.) Auker then agreed with the court that based on his response date of April 30, 2020, to Cruz's grievance about insufficient meal portions, he would have received the grievance no later than April 8, 2020, the date on which Cruz began to not receive Passover meals. (*Id.* at 134:2–20.) Auker further admitted that he had no personal knowledge of whether he received Cruz's April 10 request to staff on April 13, as he testified on direct examination, but rather that he was simply assuming that was the case based on mail practices in the prison. (*Id.* at 135:2–11.)

With respect to the phone calls to the food service department, Auker testified that if phone calls came in between Monday and Friday in 2020, he would have been the one to answer those calls. (*Id.* at 135:21–23.) When asked if he answered the calls that were placed to the food services department by Hebel,

however, Auker testified that he was "not 100 percent sure" if he would have answered those calls because "it all depends on what extension he called." (*Id.* at 136:8–16.) Auker testified that there were multiple extensions on the food services department, and that if Hebel had called an extension other than the one available to him, it "would have went to one of [his] supervisors." (*Id.* at 136:12–24.) Auker then testified, however, that if the information regarding Mr. Cruz's meals had been reported to one of his supervisors, the information would have been reported to him so that the issue could be "resolved and fixed immediately." (*Id.* at 136:25–137:7.) Given Auker's earlier testimony that he first heard about Cruz's missing Passover meals on April 14, 2020, he testified that Hebel must not have called the dietary department as he had testified. (*Id.* at 137:8–15.)

On follow-up questioning by Defendants' counsel, Auker testified that Hebel could have called the dietary department and he simply was not aware of it. (*Id.* at 137:22–138:8.) The court then asked whether this was inconsistent with his earlier testimony that calls to the department that he did not answer would go to his supervisors, and he responded that it was not inconsistent because the "10 to 12 instructors" in the department also could have answered the call. (*Id.* at 138:16–24.) Auker reiterated, however, that if someone in the dietary department received the message from Hebel, it should have been relayed to him. (*Id.* at 138:25–139:2.)

The Defendants' final witness was Defendant Marzzacco. (*Id.* at 139.) Marzzacco testified that she is a correctional food service instructor at SCI-Benner Township and held that position at all times relevant to this case. (*Id.* at 140:3–14.) In April 2020, she was working the 5:00 a.m. to 1:00 p.m. shift. (*Id.* at 140:15–17.)

Marzzacco testified that in April 2020, she had a list of 16 inmates to deliver Passover meals to, and that Cruz was not on the list. (*Id.* at 141:4–7.) Marzzacco testified that she did not intentionally deny Cruz a Passover meal. (*Id.* at 143:18–20.) She also did not recall any instance of Hebel or anybody else talking to her about Cruz not receiving his Passover meals. (*Id.* at 144:9–24.)

## **Findings of Fact**

Cruz is a Jewish inmate who was signed up to receive Passover meals in April 2020. (Trial Transcript 113:11–17; Ex. P2.) The list of inmates receiving Passover meals was initially prepared by Chaplain McCoy, and then transferred to a spreadsheet by Defendant Auker. (Trial Transcript at 116:11–25.) The Chaplain's list included Cruze but Defendant Auker's spreadsheet did not. (*Id.* at 117:14–118:5; Ex. D2 at DOC000125.) This led to Cruz being denied Passover meals from April 8, 2020, through April 14, 2020. (Trial Transcript at 65–80.)

The court finds that in preparing the spreadsheet of inmates who were supposed to receive Passover meals, Defendant Auker intentionally omitted Cruz.

The court bases this finding primarily on its credibility assessments of Auker, Cruz, and correctional officer Hebel.

The court finds defendant Auker's testimony not credible because of several material inconsistencies in his testimony. First, Auker initially testified that he had never seen Cruz's grievance about insufficient meal portions, but after his counsel showed that he had responded to the grievance on April 30, 2020, Auker admitted that he had seen the grievance. (*Id.* 127:17–128:17.) Further questioning from the court elicited testimony from Auker that not only had he seen the grievance, he had likely received it on April 8, 2020, the exact date that Cruz began to be denied his Passover meals. (*Id.* at 134:2–20.)

Second, on direct examination by his counsel, Auker appeared to be certain that he had not received Cruz's request to staff related to his Passover meal until April 13, 2020, and that he may not have actually read it until April 14, 2020. (*Id.* 125:20–126:3.) When pressed on this point by the court, however, Auker appeared far less certain, and testified that he did not have personal knowledge of when he received the document and was essentially just speculating on when he would have received it based on typical mail practices in the prison. (*Id.* at 135:2–11.)

Third, Auker wavered throughout his testimony about phone calls that were made to the food service department. He initially testified that he did not receive any of the phone calls regarding Cruz missing his Passover meals, (*Id.* at 122:22–

123:3), but then testified that if phone calls came to the food service department he would be the one to answer them. (*Id.* at 135:21–23.) When asked to explain this testimony with regard to the calls that were made by Hebel, however, Auker hedged his testimony by stating that it would depend which extension was called and that if Hebel had called a different extension he would have spoken with one of Auker's supervisors rather than him. (*Id.* at 136:8–24.) After noting that calls to his supervisors would have been relayed to him, however, he backtracked on the calls from Hebel and testified that Hebel must have not have actually called the food service department at all and that Hebel's testimony to that effect was incorrect. (*Id.* 136:25–137:15.) He then backtracked from *that* statement on follow-up examination by his counsel by stating that Hebel may have called the department and he simply was not aware of it. (*Id.* at 137:22–138:8.) When the court pointed out this apparent inconsistency, Auker testified that the call could have been handled by one of the instructors in the food service department and not relayed to him, (*Id.* at 138:16–24), despite his earlier testimony that (1) calls that were not answered directly by him were answered by one of his supervisors and not the instructors; and (2) that any calls made to the food service department would have been relayed to him, (*see id.* at 136.)

In light of all of these inconsistencies in Auker's testimony, the court finds his testimony not credible and finds that he was informed that Cruz was not

receiving his Passover meals several times between April 8, 2020, and April 14, 2020, including through multiple phone calls by officer Hebel and a request to staff sent by Cruz.

Auker's testimony is also undermined by the testimony of Officer Hebel, which the court finds completely credible based on observation of his demeanor during the testimony and because there does not appear to be any motive for Hebel to testify against his coworkers and in favor of Cruz's case against them. Hebel testified to multiple occasions in which he personally called the food service department about Cruz not receiving Passover meals. (*Id.* at 21:22–22:1, 25:21–26:1.) Although Hebel testified that he could not remember whether he had spoken with Auker directly, (*id.* at 32:3–14), the court finds based on Auker's testimony—as discussed above—that Hebel's calls to the food service department would have been reported to Auker even if the two had not spoken directly.

In addition to credibility determinations, the court's finding that Auker acted intentionally is bolstered by the evidence that he received Cruz's grievance complaining about reduced meal portions no later than April 8, the date on which Cruz began to not receive his Passover meals. (*Id.* at 134:2–20.)

Given the court's credibility determinations and Defendant Auker's apparent motive to deny Cruz his Passover meals based on the grievance he filed against

him, the court finds that Auker's act of leaving Cruz off the spreadsheet of inmates who were slated to receive Passover meals was intentional.

With respect to Defendant Marzzacco, the court finds that she did not do anything to intentionally violate Cruz's civil rights. The court finds her testimony credible that she simply received a list of inmates who were to be given Passover meals and followed that list. (*Id.* at 141–43.) The court also finds her testimony credible that she did not recall any instance of Hebel or anyone else talking to her about Cruz not receiving Passover meals. (*Id.* at 144.)

## CONCLUSIONS OF LAW

### A. Liability

A prison official violates a prisoner's First Amendment right to free exercise of religion if he takes an action that impinges on the plaintiff's sincerely held religious belief without a legitimate penological reason for doing so. *Turner v. Safley*, 482 U.S. 78, 89 (1987); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000).

Defendant Auker violated Cruz's sincerely held religious beliefs by intentionally withholding Passover meals from him. There was no legitimate penological reason for Auker doing so. Rather, he was motivated by animus towards Cruz because Cruz filed a grievance against him shortly before Passover began.

A government official violates a plaintiff's Fourteenth Amendment right to equal protection when he intentionally treats the plaintiff differently from other similarly situated individuals and there is no rational basis for the different treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Defendant Auker intentionally treated Cruz differently from similarly situated inmates Kenneth White and Granville Tucker when he denied Cruz Passover meals, and there was no rational basis for the different treatment.

Defendant Marzzacco was not personally involved in either constitutional violation because the record shows that she simply followed the list as it was written and had no role in excluding Cruz from the list. *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 289–90 (holding that defendant may only be liable for civil rights violation based on her own actions and not simply because she is in the vicinity of where a civil rights violation occurred).

**B. Damages**

For a prisoner plaintiff to recover damages "for mental or emotional injury suffered while in custody" the plaintiff must make "a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. 1997e(e). To satisfy this physical injury requirement, the plaintiff must establish "a less-than-significant-but-more-than-*de minimis* physical injury as a predicate to allegations of emotional injury." *Mitchell v. Horn*, 318 F.3d 523, 536 (3d Cir. 2003).

Cruz cannot recover compensatory damages in this case because the physical injuries he testified to—temporary difficulty sleeping, low energy, and "growing pain type pains" in his knees—are *de minimis*. Thus, because the PLRA bars compensatory damages, the court will award Cruz nominal damages of $1.

Additionally, although Cruz may not recover compensatory damages, this does not by itself bar him from recovering punitive damages: punitive damages may be awarded "based solely on a constitutional violation, provided the proper showing is made." *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000). "The purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Id.* (quoting *Memphis v. Cmty. Sch. Dist. v. Stachura*, 477 U.S. 99, 306 n.9 (1986)). These damages arise solely from the violation of the constitutional right and are not considered damages for mental or emotional harm that are barred by Section 1997e(e). *Id.* Thus, "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others," the plaintiff may recover punitive damages even in the absence of compensatory damages. *Id.* (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983))).

The court finds that punitive damages against Defendant Auker are appropriate in this case. As the court found above, Auker was aware that Cruz was supposed to be on the list of inmates receiving Passover meals before the holiday

began, but intentionally removed him from that list. He also was informed of Cruz's absence from the list multiple times before relenting and putting him on the list six days after the holiday began. These actions show a callous indifference to Cruz's right to practice his religion.

When considering the appropriate amount of punitive damages, courts should consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

The court finds that an award of $10,000 of punitive damages against Defendant Auker is appropriate. To begin, the initial action by Auker to remove Cruz from the list of inmates who were to receive Passover meals was reprehensible because Auker denied Cruz the opportunity to observe his religion in retaliation for Cruz's prior grievance against him. The court finds that the action became more reprehensible with each instance that Cruz or another individual informed Auker that he was not on the list and Auker continued to not correct his initial action. This choice to willfully repeat the act that violated Cruz's constitutional rights makes Auker's actions more morally culpable. *See, e.g.*,

*Washington v. Gilmore*, 124 F.4th 178, 186 (3d Cir. 2024) (finding that repeated conduct was a "subfactor" that increased the reprehensibility of the defendant's conduct (citing *State Farm*, 538 U.S. at 419)); *Brilla v. Petit*, 57 F. App'x 947, 948–49 (3d Cir. 2003) (finding that there was sufficient basis for punitive damages where defendant repeatedly refused to return personal property to plaintiff despite being informed that he should return the property).

Turning next to the relationship between actual harm and punitive damages, the court finds that a relatively modest amount of punitive damages in the amount of $10,000 is warranted given that Cruz suffered only *de minimis* physical harm and no economic harm as a result of Auker's actions.

Finally, $10,000 appears to be a reasonable sum of punitive damages in relation to other recent awards of punitive damages in cases where a defendant violated a plaintiff's civil rights and the plaintiff suffered no or minimal physical injuries. *See, e.g.*, *Wexler v. Hawkins*, 173 F.4th 478, 485–90 (3d Cir. 2026) (reducing punitive damages award from $250,000 to $12,000 in case where defendants were found liable for excessive force, assault and battery, retaliation, false imprisonment, false arrest, and malicious prosecution arising from actions during plaintiff's arrest in which plaintiff suffered minor physical injuries); *Simonds v. Boyer*, No. 2:21-CV-00841, 2026 WL 2093764, at *3–5 (W.D. Pa. July 21, 2026) (reducing jury's verdict of $400,000 in punitive damages to $200,000

where defendant was found liable for constitutional violations but plaintiff suffered no physical injury and $50,000 in compensatory damages were awarded); *Murray v. McCoy*, No. 1:21-CV-00320, 2026 WL 923621, at *24–33 (M.D. Pa. Apr. 6, 2026) (upholding jury's award of $20,000 in punitive damages where defendant prison official violated plaintiff's civil rights by filing false misconduct charges against him in retaliation for exercising his First Amendment rights); *Hollobaugh v. Roberts*, 2:21-CV-00069 (W.D. Pa. jury verdict issued Aug. 30, 2022) (awarding plaintiff $5,000 in punitive damages for case in which defendant violated his rights during traffic stop and plaintiff suffered unspecified physical injuries); *Cole v. Encapera*, No. 2:15-CV-00104 (W.D. Pa. jury verdict issued Mar. 13, 2020) (awarding plaintiff $1,000 in punitive damages from each defendant in case where defendant police officers were found liable for retaliating against plaintiff restaurant owner and otherwise violating plaintiff's rights after he complained that officers were harassing female customers at his restaurant).

## CONCLUSION

For the foregoing reasons, the court will enter judgment in favor of Cruz with respect to his claims against Defendant Auker and enter judgment in favor of Defendant Marzzacco with respect to the claims against her. Defendant Auker will be ordered to pay $1 in nominal damages and $10,000 in punitive damages to Plaintiff. An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: August 18, 2026